1

2

3

4

5

6

7

8  # UNITED STATES DISTRICT COURT

9  ## EASTERN DISTRICT OF CALIFORNIA

10

11  HELEN MARY JIMENEZ,

            Plaintiff,

            Case No. 1:17–cv–01552–SKO

12

13      v.

            ORDER ON PLAINTIFF'S SOCIAL
            SECURITY COMPLAINT

14  NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

15              Defendant.            (Doc. 1)

16  _____/

17

18  ## I.  INTRODUCTION

19        On November 20, 2017, Plaintiff Helen Mary Jimenez ("Plaintiff") filed a complaint

20  under 42 U.S.C. §§ 405(g) and 1383(c) seeking judicial review of a final decision of the

21  Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application

22  for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (Doc. 1.)

23  The matter is currently before the Court on the parties' briefs, which were submitted, without

24  oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

25  ## II.  BACKGROUND

26        On May 10, 2013, Plaintiff filed an application for DIB and SSI, alleging that she became

27  disabled on April 20, 2011, due to a torn rotator cuff, carpel tunnel syndrome, and high blood

28

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 8.)

pressure. (Administrative Record ("AR") 176–89, 208.) Plaintiff was born on May 14, 1954, and was 56 years old on the alleged disability onset date. (*See* AR 176.) Prior to her alleged onset date, Plaintiff tore the rotator cuff in her right shoulder in 1998 and had surgery on her shoulder in 1999 and 2000. (AR 398.) Plaintiff did not complete high school, and previously worked as a school district clerk from 1995 to 1998, and performed clerical work at a garbage company from 2003 to 2011. (AR 209.)

**A.    Relevant Medical Evidence[2]**

**1.       Workers' Compensation Doctors**

On February 10, 2011, Plaintiff presented to John Emerzian, D.C., a chiropractor with San Joaquin Total Care in Fresno, California, requesting a referral for an orthopedic consultation in conjunction with her state workers' compensation claim. (AR 351.) Dr. Emerzian referred Plaintiff to Peter McGann, M.D., for an orthopedic consultation regarding her bilateral shoulders and requested additional in-home physiotherapy for the next two weeks. (AR 351.)

On March 29, 2011, Plaintiff returned for a follow up appointment and Dr. Emerzian diagnosed Plaintiff with "shoulder sprain/strain left predominant unresolved." (AR 352.) Dr. Emerzian noted that Dr. McGann recommended arthroscopic shoulder reconstruction surgery, which Dr. McGann performed in May 2011.[3] (AR 352, 356.) Following the surgery, Dr. Emerzian's treatment notes reflect a significant improvement in Plaintiff's level of functioning. (*See* AR 353–58.) On June 16, 2011, Dr. Emerzian noted that Plaintiff's range of motion was improving and she was actively participating in physical therapy. (AR 353.) On July 11, 2011, Dr. Emerzian noted Plaintiff's response to care was "overtly positive" and recommended Plaintiff return to work on light duty with no overhead lifting. (AR 354.) Dr. Emerzian noted continued improvement at Plaintiff's appointments on August 12 and 30, 2011. (AR 355–56.) On October 19, 2011, Dr. Emerzian noted that Plaintiff's left shoulder was "completely healed," but there was a lack of response to care in Plaintiff's right shoulder. (AR 357.)

---

[2] As Plaintiff's assertions of error are limited to the ALJ's consideration of the medical opinions of John Emerzian, D.C., and William Foxley, M.D., only evidence relevant to those arguments is set forth in this Order.

[3] The Court notes that Dr. McGann's treatment notes were not included in the administrative record due to his retirement (*see* AR 270) and as a result, the only evidence of Dr. McGann's findings, recommendations, and course of treatment is in the treatment notes of Dr. Emerzian.

On December 15, 2011, Dr. Emerzian requested an MRI of Plaintiff's right shoulder based on "the clinical presentation of pain, range of motion loss, periarticular crepitance, and instability of the right shoulder." (AR 359.) However, Dr. Emerzian noted Plaintiff remained "clinically capable of all forms of regular work." (AR 359.) On April 23, 2012, Dr. Emerzian expressed frustration that Plaintiff's case "has been stalled" and noted that an MRI and nerve conduction study, were the appropriate protocols to move the case forward, but these evaluations were not being approved by Plaintiff's workers' compensation insurance provider. (AR 363.)

On May 18, 2012, an MRI was performed on Plaintiff's right shoulder, which revealed findings suggestive of calcific tendonitis. (AR 380.) The MRI showed that Plaintiff's rotator cuff was intact, but also revealed several minor abnormalities in the shoulder.[4] (AR 380.) On May 23, 2012, Dr. Emerzian noted that the nerve conduction studies were normal and requested another orthopedic consultation for Plaintiff's right and left shoulders. (AR 364.)

On June 21, 2012, Plaintiff presented to William Foxley, M.D., a physician practicing Occupational Medicine at San Joaquin Total Care, for a follow up appointment related to her workers' compensation claim. (AR 368.) Plaintiff continued to complain of right shoulder pain and added that she was now experiencing lumbar spine pain. (AR 368.) Upon physical examination, Dr. Foxley noted reduced range of motion and tenderness in the subacromial space, but Plaintiff's bicep was otherwise intact and her strength appeared to be intact other than pain related to weakness. (AR 368.) A cortisone shot was administered, which improved Plaintiff's symptoms. (AR 368.) On July 6, 2012, Dr. Emerzian noted that Plaintiff's shoulder symptoms persisted, with the right shoulder being worse than the left shoulder, and that he received no response to his previous request for an orthopedic consultation. (AR 365.)

On August 21, 2012, Dr. Emerzian noted that Dr. McGann had recommended Plaintiff proceed with surgery on her right shoulder and Dr. Emerzian requested the surgery move forward. (AR 372.) Dr. Emerzian repeated his request for surgery in his treatment notes on

---

[4] The specific findings by the doctor reviewing the images included "a small amount of fluid in the subacromial subdeltoid bursa" that "may reflect bursitis," "status post subacromial decompression with an acromioplasty and resection of the distal end of the clavicle," and "increased signal in the anterior superior labrum" that "may represent labral degeneration or degenerative fraying of the labrum." (AR 380.)

October 29, 2012, and noted that all alternative forms of conservative care had failed. (AR 371.) On May 3, 2013, Dr. Emerzian noted that Plaintiff was still in need of surgery on her right shoulder. (AR 373.) Dr. Emerzian also noted that Dr. McGann had retired, and requested an orthopedic evaluation with Dr. Peter Simonian, M.D. (AR 373.) On June 7, 2013, Dr. Emerzian repeated his request for an orthopedic evaluation with Dr. Simonian, and noted that Plaintiff remained at work with no restrictions or limitations. (AR 374.)

Following Dr. Emerzian's repeated requests, the record shows Dr. Simonian performed arthroscopic surgery on Plaintiff's right shoulder in August 2013.[5] (*See* AR 400–01.) However, when Plaintiff next visited Dr. Emerzian on October 3, 2013, he only noted that Plaintiff was experiencing carpal tunnel syndrome symptoms in her bilateral wrists, and did not make any findings or observations related to her shoulders. (AR 375.) Dr. Emerzian diagnosed Plaintiff with bilateral wrist sprain/strain and recommended Plaintiff remain off work for the next month. (AR 375.)

On January 3, 2014, Plaintiff reported to Dr. Foxley that her medication, which included Ibuprofen, Norco, Tramadol, and Flexeril, improved her functional activities of daily living, but she continued to experience pain in her bilateral shoulders. (AR 476.) Dr. Foxley noted tenderness in Plaintiff's bilateral shoulders with right being greater than left, and limited range of motion in both shoulders. (AR 476.)

On January 9, 2014, Plaintiff reported to Dr. Emerzian that she wished to move forward with surgical intervention for her wrists. (AR 475.) Dr. Emerzian noted that he had requested wrist braces in December, but he had received no response from Plaintiff's workers' compensation insurance provider. (AR 475.) On February 20, 2014, Plaintiff complained to Dr. Foxley of pain in her shoulders, wrists, and lower back, but Dr. Foxley noted Plaintiff had full range of motion in her wrists "with hesitation based on pain from the wrists." (AR 474.) Dr. Foxley also noted that Plaintiff was not working, but completed her activities of daily living with no problems and "does everything at home except for any heavy lifting." (AR 474.) Plaintiff continued to report pain to Dr. Foxley in her bilateral shoulders, and Dr. Foxley noted tenderness

---

[5] See Section III.A.2 below for a summary of Dr. Simonian's treatment notes.

in both shoulders and restricted range of motion bilaterally, at her appointments on March 28, May 5, and June 6, 2014.  (AR 470–71, 473.)

On June 10, 2014, Plaintiff complained to Dr. Emerzian of problems with her wrists.  (AR 469.)  Dr. Emerzian noted Plaintiff's "degenerative joint disease in the wrists need[s] further evaluation and care" and requested authorization to proceed with carpal tunnel surgery.  (AR 469.)  On June 13, 2014, Dr. Emerzian noted Plaintiff's right shoulder needed further intervention and her thumb and hand symptoms also needed further evaluation and care.  (AR 467.)  On June 24, 2014, Dr. Emerzian expressed frustration regarding the care Plaintiff was receiving and stated in his treatment notes that a "combination of events have left [Plaintiff] with a tremendous amount of instability" and "[a]t this point, we either wind down all forms of care or come up with a game plan with all parties in agreement."  (AR 465.)

On July 3, 2014, Plaintiff reported to Dr. Foxley that her pain rated a six out of ten in her shoulders and eight out of ten in her wrists.  (AR 464.)  Plaintiff further reported her pain increased with household chores.  (AR 464.)  Upon physical examination, Dr. Foxley noted Plaintiff was in no acute distress, but exhibited decreased range of motion in her shoulders and tenderness in her shoulders, deltoids, trapezius, and c-spine.  (AR 464.)  Dr. Foxley also noted Plaintiff's grip strength was four out of five in her right hand, and five out of five in her left hand.  (AR 464.)  Dr. Foxley's examinations revealed similar findings at Plaintiff's follow up appointments on July 30, August 27, September 24, October 29, and November 26, 2014.  (AR 458–62.)  At her appointments with Dr. Foxley on December 31, 2014, and January 21, 2015, Plaintiff reported the pain in her wrists was eight out of ten with medications.  (AR 456–57.)  On January 21, 2015, Dr. Foxley recommended bilateral hand massages to treat the pain in Plaintiff's wrists, and requested bilateral wrist bands for added comfort.  (AR 456.)

In February 2015, Plaintiff reported to Dr. Emerzian that the pain in her upper extremities was intolerable, but her symptoms waxed and waned depending on the activities.  (AR 454–55.)  Dr. Emerzian continued to recommend Plaintiff remain off work and noted that Plaintiff received wrist supports to assist with her activities of daily living, but her wrists were becoming weak.  (AR 454–55.)  Plaintiff continued to complain to Dr. Foxley of wrist pain at her

5

appointments in March and May 2015. (AR 451, 453.) On May 22, 2015, Plaintiff reported to Dr. Foxley that she did not know if her insurance carrier approved the hand massage treatment he previously requested. (AR 451.) Plaintiff further reported that the wrist pain was constant and aggravated by lifting, carrying, pushing, reaching, bending, cooking, and cleaning. (AR 451.)

In June 2015, Dr. Emerzian noted that Plaintiff's wrist symptoms waxed and waned depending upon activity, but she continued to be disabled because of her wrists symptoms. (AR 450.) Dr. Emerzian also noted "severe spasms in the right and left cervical dorsal area and right wrists" upon palpation. (AR 449.) In June 2015, Plaintiff also reported to Dr. Foxley that the pain in her shoulders and wrists was nine of ten without medications, but seven to eight out of ten with medications. (AR 448.) Plaintiff further reported that the pain was constant, but alleviated by taking medications, resting, and wearing wrist supports. (AR 448.) Dr. Foxley renewed his request for authorization to dispense bilateral wrist braces and requested a consultation with a hand specialist. (AR 448.) Plaintiff continued to experience similar levels of pain in her shoulders and wrists in July 2015, and Dr. Foxley renewed his request for a consultation with a hand specialist. (AR 446.)

On August 19, 2015, Plaintiff reported to Dr. Foxley that her hands were going numb, especially during the night. (AR 444.) Upon examination, Dr. Foxley noted moderate muscle spasms, tenderness, and subluxation in both shoulders, wrists, and hands. (AR 444.) Dr. Foxley noted similar findings at Plaintiff's appointment on September 23, 2015. (AR 443.) At an appointment on October 21, 2015 with Dr. Foxley, Plaintiff complained of pain and numbness in both arms and hands, and reported that the pain in her hands was eight out of ten with medications and ten out of ten without medications. (AR 442.) On October 26, 2015, Dr. Emerzian noted that Plaintiff's wrist symptoms waxed and waned depending on her activity, and repeated the request for a consultation with a hand specialist. (AR 441.)

At an appointment on November 17, 2015 with Dr. Foxley, Plaintiff continued to complain of pain and numbness in both hands and arms, but reported that medication relieved some of her pain. (AR 440.) Dr. Foxley expressed concern at the level of opiates Plaintiff was

taking, and requested authorization for a referral to a pain management specialist. (AR 440.)
Plaintiff continued to report similar symptoms at her appointments with Dr. Foxley in December
2015, and January, February, and March 2016. (AR 434, 436, 438, 478.) She also reported that
when she took medications, she could perform light household chores such as washing dishes,
light loads of laundry, and making her bed. (AR 434, 436, 438, 478.) Dr. Foxley noted in
January 2016 that Plaintiff was denied her consultation with a hand specialist, and in February
2016, Dr. Foxley renewed his request for a consultation with a hand specialist due to increased
pain in Plaintiff's hands. (AR 435, 437.)

Dr. Foxley also completed a medical source statement in March 2016. (AR 481–83.) Dr.
Foxley diagnosed Plaintiff with bilateral wrist sprains with numbness in both wrists. (AR 481.)
He opined Plaintiff could occasionally lift and carry less than ten pounds and rarely lift ten
pounds, but never lift twenty pounds. (AR 482.) Dr. Foxley further opined that Plaintiff could
use her upper extremities for handling, fingering, and reaching only 50 percent of the day. (AR
482.)

### 2.  Peter Simonian, M.D.

On June 6, 2013, Plaintiff met with Dr. Simonian for an orthopedic consultation related to
her right shoulder. (AR 398–99.) Plaintiff reported that she tore her rotator cuff in 1998 and
had surgeries in 1999 and 2000, but continued to experience ongoing pain. (398.) Dr.
Simonian's physical examination was positive for impingement, tenderness, and reduced rotator
cuff strength. (AR 398.) Following his physical examination and review of Plaintiff's medical
records, Dr. Simonian diagnosed Plaintiff with "symptomatic calcific tendinitis and
impingement" and administered a cortisone injection, which Plaintiff tolerated well. (AR 398–
99.) On July 10, 2013, Plaintiff reported that the cortisone shot was only helpful for two weeks,
and she would like to proceed with arthroscopic surgery on her right shoulder. (AR 397.)

On August 13, 2013, Dr. Simonian performed arthroscopic surgery on Plaintiff's right
shoulder. (AR 400–01.) One week after the surgery, on August 20, 2013, Plaintiff reported she
was doing well and her pain was controlled. (AR 395.) Six weeks after her surgery, on
September 30, 2013, Plaintiff reported she was still doing well, and Dr. Simonian noted that

Plaintiff was not working, but was capable of working subject to certain limitations. (AR 394.) Three months after the surgery, on November 15, 2013, Plaintiff reported that she was doing "fairly well," but she was having some recent "popping and pain" in her shoulder. (AR 393.) Dr. Simonian administered a cortisone injection, which Plaintiff tolerated well. (AR 393.) Four and a half months after the surgery, on December 30, 2013, Plaintiff reported the cortisone shot provided some relief, but she still had ongoing pain in her shoulder. (AR 392.)

### 3. Michael Jimenez, MPT

On August 27, 2013, Plaintiff presented to physical therapist Michael Jimenez for an initial evaluation. (AR 391.) Plaintiff reported that she had no pain, but her right shoulder felt "a bit stiff" with limited range of motion. (AR 391.) Mr. Jimenez recommended Plaintiff participate in physical therapy twice a week for six weeks to restore her strength and range of motion in her post-surgery shoulder. (AR 391.)

On September 27, 2013, Plaintiff reported that her shoulder was "progressing steadily," but remained sore. (AR 390.) Mr. Jimenez noted that Plaintiff's strength and range of motion were improving. (AR 390.) On November 12, 2013, Plaintiff reported that her shoulder continued to be sore. (AR 388.) Mr. Jimenez noted that Plaintiff's range of motion was restored to within normal limits, but her strength remained compromised due to ongoing soreness and inflammation. (AR 388.)

### 4. Steven Stoltz, M.D.

In October 2013, Dr. Stoltz, a doctor of internal medicine at Valley Health Resources in Fresno, California, performed a consultative examination of Plaintiff. (AR 274–82.) Plaintiff reported a history of bilateral shoulder pain, as well as bilateral carpal tunnel syndrome and hypertension. (AR 274.) Plaintiff further reported intermittent back pain and pain in her wrists as well as the base of both thumbs. (AR 274, 276.)

Upon physical examination, Dr. Stoltz noted Plaintiff was alert and oriented and in no acute distress. (AR 276.) Range of motion in her neck and back was within normal limits, with the exception of forward flexion of her back, which was limited to 70 degrees. (AR 276–77.) Plaintiff's grip strength was equal bilaterally, but diminished overall, and the range of motion in

her wrists and elbows was within normal limits, but the range of motion in her right shoulder was limited.  (AR 277.)

Dr. Stoltz diagnosed Plaintiff with bilateral shoulder pain, bilateral carpal tunnel syndrome, hypertension, and intermittent low back pain.  (AR 278.)  Dr. Stoltz opined Plaintiff had no restrictions with sitting, standing, or walking.  (AR 279.)  He also opined Plaintiff could lift up to ten pounds occasionally and perform postural activities without restriction.  (AR 279.)  However, due to the pain in both shoulders and carpal tunnel syndrome, Plaintiff could only occasionally perform manipulative activities that would include reaching, handling, grasping, pushing, and pulling.  (AR 279.)

**5.      State Agency Physicians**

On October 17, 2013, L. Kiger, M.D., a Disability Determination Services medical consultant, reviewed the medical evidence of record and concluded Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour day with normal breaks, and sit six hours in an eight-hour day with normal breaks.  (AR 62.)  Dr. Kiger also concluded Plaintiff could perform frequent handling and fingering with her bilateral upper extremities and had no limitations balancing, stooping, kneeling, crouching, crawling, and climbing ramps or stairs, but could only occasionally climb ladders, ropes and scaffolds.  (AR 62–63.)  Plaintiff requested reconsideration of Dr. Kiger's opinion, and on February 24, 2014, another Disability Determination Services medical consultant, I. Ocrant, M.D., performed an independent review of Plaintiff's medical records and affirmed Dr. Kiger's opinion.  (AR 96–97.)

**B.      Administrative Proceedings**

The Commissioner denied Plaintiff's application for DIB and SSI initially on October 30, 2013, and again on reconsideration on March 27, 2014.  (AR 102–06, 113–18.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 119–21.)  Plaintiff appeared with counsel at the hearing on May 11, 2016, and testified before an ALJ as to her alleged disabling conditions.  (AR 17; *see generally* AR 34–55.)

### 1. Plaintiff's Testimony

Plaintiff testified that she is unable to work because of the pain in her hands and fingers. (AR 42–43.) Plaintiff also testified that her right shoulder limits her ability to work because she is always in pain and her shoulder locks up. (AR 45.) Plaintiff takes medication for the pain, which helps relieve the pain, but makes her drowsy. (AR 43–44.) When Plaintiff does not take medication, the pain in her hands and shoulders is an eight or nine out of ten. (AR 44.) When she takes medication, the pain is about a six out of ten. (AR 44.) According to Plaintiff, Nurse Practitioner Cynthia Guerra, who Plaintiff also saw at San Joaquin Total Care, prescribed splints for her wrists one month prior to the hearing. (AR 48–49.) However, according to Plaintiff, they do not help. (AR 49.)

Plaintiff lives in a house with her husband and drives her car two to seven times a week. (AR 35–36, 38.) She drives to doctors' appointments, to go shopping, and to her daughter's house where she visits with her grandchildren. (AR 38–39.) However, she testified that driving is "very hard" for her because holding the steering wheel is painful on her shoulders and hands. (AR 38.) According to Plaintiff, she can lift and carry about five pounds, but she can only do housework, such as washing dishes, for five minutes at a time because of the pain in her hands and fingers. (AR 42, 44.) When her hands and fingers are too painful to work, Plaintiff rests for at least an hour before she can go back to work. (AR 42–43.) She lays down and massages or exercises her hands, but she does not use ice or heat packs because they do not help. (AR 46.)

Plaintiff's hands also swell about three days per week. (AR 47.) When her hands get swollen, she massages them or sometimes uses a heating pad. (AR 47.) She also experiences constant weakness and numbness in her hands. (AR 48.) According to Plaintiff, she has difficulty using her fingers to button buttons, zip zippers, or pick up a coin, but she can eventually do these things after a few tries. (AR 47, 49.) Plaintiff can also hold a pen or pencil and write for ten to fifteen minutes, but would have to take a break for about forty-five minutes before she could write again. (AR 47–48.)

### 2. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff has past work experience

as an accounting clerk, Dictionary of Operational Titles ("DOT") code 216.482-010, which was skilled, sedentary work. (AR 52.)

The ALJ then asked the VE four hypothetical questions considering a person of Plaintiff's age, education, and work experience. First, the ALJ asked the VE to consider a person who can lift and carry twenty pounds occasionally and ten pounds frequently. (AR 52.) This person could also occasionally climb ladders, ropes, and scaffolds; occasionally reach overhead with her right upper extremity; and frequently handle, finger, and feel bilaterally. (AR 52.) The ALJ then asked the VE whether such a person could perform any of Plaintiff's past work. (AR 52.) The VE testified that such a person could perform Plaintiff's previous work as an accounting clerk. (AR 52.)

The ALJ then asked the VE a second hypothetical question considering a person than can lift and carry ten pounds, and occasionally reach, handle, grasp, push, and pull bilaterally. (AR 52–53.) The VE testified that such a person could not perform any of Plaintiff's previous work and there would be no other jobs available. (AR 53.)

The ALJ asked the VE a third hypothetical question considering an individual that can lift and carry less than ten pounds rarely and occasionally, and use her hands, fingers, and arms four hours out of an eight-hour workday. (AR 53.) The VE testified such an individual could not perform any of Plaintiff's previous work, and there would be no other jobs this individual could perform. (AR 53.)

Finally, the ALJ asked the VE a fourth hypothetical question considering the same person with the same capabilities as outlined in the first hypothetical, except this person would be limited to occasional handling, fingering, and feeling. (AR 53.) The VE testified that such a person could not perform any of Plaintiff's past work. (AR 53–54.)

Plaintiff's counsel also asked the VE one hypothetical question. Plaintiff's counsel asked whether the individual in the ALJ first hypothetical question would still be able to perform Plaintiff's previous work if the individual needed an additional one-hour break each day. (AR 54.) The VE responded that such a person would not be able to retain any work. (AR 54.)

**C.    The ALJ's Decision**

In a decision dated July 12, 2016, the ALJ found that Plaintiff was not disabled.  (AR 17–27.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920.  (AR 19–27.)  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date, April 20, 2011.  (AR 19.)  At Step Two, the ALJ found that Plaintiff had the severe impairments of "right shoulder calcific tendinitis and impingement with anterior and superior labral tears of the glenohumeral joint, status post right arthroscopic shoulder decompression and debridement on August 13, 2013; right thumb carpometacarpal degenerative arthritis and local tendonitis; and a history of bilateral carpal tunnel releases."  (AR 19–20.)  However, at Step Three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (AR 21.)  The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[6]

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently, occasionally climb ladders, ropes, and scaffolds, and perform occasional overhead reaching with the right upper extremity, and frequent handling and fingering with the bilateral upper extremities.

(AR 21.)  Of particular relevance to the claims asserted by Plaintiff in the instant action, the ALJ gave little weight to the opinion of Dr. Foxley because there was little explanation for the limitations and it was inconsistent with Plaintiff's treatment records including unremarkable grip strength examinations and normal nerve conduction studies, as well as other medical opinions in the record including the opinions of Drs. Kiger and Ocrant.  (AR 25–26.)  The ALJ also gave little weight to statements by Plaintiff's chiropractor, Dr. Emerzian, because chiropractors are not acceptable medical sources.  (AR 25.)  The ALJ further reasoned Dr. Emerzian's opinion was

---

[6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or an equivalent work schedule.  Social Security Ruling 96-8p.  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

conclusory and made in the context of a workers' compensation claim, not a social security claim. (AR 25.)  The ALJ determined that, given her RFC, Plaintiff was able to perform her past relevant work as an accounting clerk (Step Four), and thus she was not disabled (Step Five).  (AR 26.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on September 15, 2017.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.  Plaintiff filed a complaint before this Court on November 20, 2017, seeking review of the ALJ's decision.  (Doc. 1.)

## III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec*., 528 F.3d 1194, 1198 (9th Cir. 2008).  The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.  APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d). If not, before considering the Fourth Step, the ALJ must determine the claimant's residual functional capacity, which is the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from the claimant's impairments. *Id*. §§ 404.1520(e), 416.920(e). Next, at Step Four, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V. DISCUSSION

In her Opening Brief, Plaintiff contends the ALJ erred in two respects: (1) the ALJ failed to articulate sufficient reasons for discrediting Dr. Foxley's opinion; and (2) the ALJ erroneously discredited the statements of Plaintiff's chiropractor, Dr. Emerzian. (*See* Doc. 16 at 20–23.)

14

1 Defendant responds that the ALJ properly weighed the conflicting evidence and medical opinions

2 regarding Plaintiff's physical limitations. (Doc. 17 at 6–9.)

3 **A.  Legal Standard**

4     The ALJ must consider and evaluate every medical opinion of record. *See* 20 C.F.R. §

5 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Mora v. Berryhill*, No.

6 1:16–cv–01279–SKO, 2018 WL 636923, at *10 (E.D. Cal. Jan. 31, 2018). In doing so,

7 the ALJ "cannot reject [medical] evidence for no reason or the wrong reason." *Mora*, 2018 WL

8 636923, at *10.

9     Cases in this circuit distinguish between three types of medical opinions: (1) those given

10 by a physician who treated the claimant (treating physician); (2) those given by a physician who

11 examined but did not treat the claimant (examining physicians); and (3) those given by a

12 physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree*

13 *v. Colvin*, No. 1:13–cv–01577–SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015).

14 "Generally, a treating physician's opinion carries more weight than an examining physician's,

15 and an examining physician's opinion carries more weight than a reviewing physician's."

16 *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v.*

17 *Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors

18 the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)).

19 The opinions of treating physicians "are given greater weight than the opinions of other

20 physicians" because "treating physicians are employed to cure and thus have a greater

21 opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273,

22 1285 (9th Cir. 1996) (citations omitted).

23     To evaluate whether an ALJ properly rejected a medical opinion, in addition to

24 considering its source, the court considers whether (1) contradictory opinions are in the record;

25 and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of

26 a treating or examining medical professional only for "clear and convincing" reasons. *Lester v.*

27 *Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995). In contrast, a contradicted opinion of a treating or

28 examining professional may be rejected for "specific and legitimate reasons that are supported

by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830–31. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes*, 881 F.2d at 751). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001),[7] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

**B.     The ALJ Stated Sufficient Reasons for Rejecting Dr. Foxley's Opinion.**

Dr. Foxley treated Plaintiff in conjunction with her workers' compensation claim and provided an opinion in March 2016 regarding Plaintiff's ability to work. (AR 481–83.) Dr. Foxley opined Plaintiff could occasionally lift and carry less than ten pounds and rarely lift ten pounds, but never lift twenty pounds. (AR 482.) Dr. Foxley further opined that Plaintiff could use her upper extremities for handling, fingering, and reaching only 50 percent of the day. (AR 482.)

In discrediting Dr. Foxley's opinion, the ALJ stated:

> This opinion is given little weight also, as Dr. Foxley provides little explanation as to why the claimant can only use her upper extremities for 50 percent of the day. The record does indicate complaints of wrist pain and numbness, but nerve conductions studies were normal (Exhibits 5F, p. 82; 9F). The weight bearing restrictions also appear excessive in light of normal nerve conduction studies, four out of five grip strength on examination, conservative course of treatment previously discussed and the inconsistency with other medical opinions concerning the claimant's weight bearing capacity.

[7] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

(AR 25–26.)  In sum, the ALJ discounted Dr. Foxley's opinion because 1) it was conclusory and inconsistent with other medical evidence in the record, 2) it was contradicted by other medical opinions, and 3) it was inconsistent with Plaintiff's conservative treatment record.  Because Dr. Foxley's opinion was contradicted by the medical opinion evidence of Disability Determination Services non-examining consultants Drs. Kiger and Ocrant, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Foxley's opinion. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830.

Here, the ALJ properly discredited Dr. Foxley's opinion because the opinion was conclusory and inconsistent with other medical evidence in the record.  Specifically, the ALJ noted that Dr. Foxley provided little explanation why Plaintiff could only use her upper extremities for 50 percent of the day.  (AR 25–26.)  Dr. Foxley's opinion is set forth in a check-the-box questionnaire with "50%" entered as the limitation in Plaintiff's ability to twist objects with her hands, manipulate objects with her fingers, and reach in front of her body and overhead with her hands.  (AR 482.)  The questionnaire provides no reason why 50 percent is the appropriate limitation or why the right upper extremities are limited to the same extent as the left.  (AR 482.)  The ALJ also noted that Dr. Foxley's weight bearing restrictions were inconsistent with objective medical evidence in the record including normal nerve conduction studies[8] and Plaintiff's four out of five grip strength.  (AR 26 (citing AR 364).)  Accordingly, the ALJ provided specific and legitimate reasons for discrediting Dr. Foxley's opinion.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (An ALJ may properly discount a treating physician's opinion that is "conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings."); *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (incongruity between treating physician's questionnaire responses and the medical records provides a specific and legitimate reason for rejecting treating physician's conclusion); *Magallenes*, 881 F.2d at 751 (A

---

[8] Plaintiff attempts to discredit the normal nerve conduction studies by emphasizing that "the record does not indicate whether testing was conducted on the shoulder, wrist, or otherwise."  (Doc. 18 at 3.)  However, the Court notes that Plaintiff's treatment notes indicate Dr. Emerzian requested the nerve conduction studies for Plaintiff's shoulders.  (AR 363 (summarizing the status of Plaintiff's right shoulder injury and stating that "right shoulder MRI and EMG are appropriate protocols" to move the case forward).)  Accordingly, the record demonstrates that Dr. Emerzian's reference to normal nerve conduction studies (AR 364), is a reference to the unremarkable condition of Plaintiff's shoulders, which is inconsistent with the extreme limitations in Dr. Foxley's opinion.

brief and conclusory form opinion which lacks supporting clinical findings is a legitimate reason to reject a treating physician's conclusion).

Plaintiff responds that the ALJ failed to apply the appropriate factors in weighing Dr. Foxley's opinion because the ALJ did not consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treating relationship, or the supportability of the opinion. (Doc. 16 at 20 (citing *Trevizo*, 871 F.3d at 676).) The Court finds, however, that the ALJ properly analyzed Plaintiff's treatment relationship with Dr. Foxley because the ALJ summarized Plaintiff's treatment notes dating back to 2011 and identified specific evidence from those treatment notes that contradicted Dr. Foxley's opinion including the normal nerve conduction studies and grip strength examination. *Magallenes*, 881 F.2d at 751 (ALJ may discredit a treating physician's opinion "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings"). Moreover, while Plaintiff identifies other evidence in the record that she contends supports Dr. Foxley's opinion (Doc. 16 at 20–21), it is "the ALJ's responsibility to make credibility findings and resolve conflicts in the medical evidence." *Weimer v. Callahan*, 124 F.3d 215 (9th Cir. 1997) (citing *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996)). "If the evidence supports more than one rational interpretation, we must uphold the decision of the ALJ; we are in no position to second-guess the ALJ's choice among conflicting medical opinions." *Id.* (citing *Allen v. Heckler*, 749 F.2d 577, 579, 580 (9th Cir. 1984)). Accordingly, the Courts finds the ALJ properly discredited Dr. Foxley's opinion because it was conclusory and inconsistent with objective medical findings in the record.

The ALJ also discredited Dr. Foxley's opinion because his opinion was contradicted by other medical opinions in the record including the opinions of state agency medical consultants Drs. Kiger and Ocrant. (AR 26.) Such opinions "may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it." *Andrews v. Shalala*, 53 at 1041; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) ("Although the contrary opinion of a non-examining medical expert does not alone constitute a specific, legitimate reason

for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record.").

Here, Drs. Kiger and Ocrant both opined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, and perform frequent handling and fingering with her bilateral upper extremities. These opinions are supported by medical evidence in the record including Plaintiff's physical therapist's opinion that Plaintiff's range of motion in her right shoulder was restored to within normal limits three months after surgery (AR 382), Plaintiff's treatment notes from August 2014 noting normal range of motion and normal strength (AR 516), and Plaintiff's statements in March 2016 that she can perform her activities of daily living such as washing dishes and taking care of her personal hygiene after she takes her medication (AR 478). Moreover, while Plaintiff identifies evidence in the record that is consistent with Dr. Foxley's opinion, Plaintiff does not contend no evidence in the record supports the opinions of Drs. Kiger and Ocrant. (Doc. 16 at 22.) Accordingly, the ALJ did not err by relying on their opinions to discredit Dr. Foxley's opinion. *Corder v. Comm'r*, No. 2:16–cv–1969–KJN, 2018 WL 466265, at *4 (E.D. Cal. Jan. 18, 2018) (holding the ALJ properly relied on contrary opinions from state agency physicians to discount a treating physician's opinion where the state agency physicians' opinions were consistent with the medical record); *Lott v. Berryhill*, No. 2:17–cv–00986–KJN, 2018 WL 4292247, at *4 (E.D. Cal. Sept. 7, 2018) (same); *Delgadillo v. Colvin*, No. 1:12–cv–703 GSA, 2013 WL 5476413, at *7 (E.D. Cal. Sept. 30, 2013) (same).

Finally, the ALJ discredited Dr. Foxley's opinion because it was undermined by Plaintiff's conservative treatment record. Generally, an "ALJ may discount a physician's opinion if it is inconsistent with the plaintiff's conservative treatment." *Embernate v. Berryhill*, No. 2:17–cv–0040–JAM–DB, 2018 WL 888986, at *6 (E.D. Cal. Feb. 14, 2018); *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (finding an ALJ reasonably discounted a physician's opinion where the claimant received conservative treatment). Plaintiff gives little attention to this reason offered by the ALJ for discounting Dr. Foxley's opinion. Plaintiff responds with one sentence that simply asserts that the ALJ's characterization of Plaintiff's treatment as "conservative" fails to account for Plaintiff's narcotic pain medication regime, trigger-point injections, past shoulder surgeries,

and failed attempts to obtain a surgical authorization for carpal tunnel syndrome. (Doc. 16 at 22). While Plaintiff cites to one unpublished Ninth Circuit case that questioned whether narcotics are properly characterized as a conservative treatment, Plaintiff fails to cite any authority where a court expressly found an ALJ erred by characterizing treatments similar to Plaintiff's as conservative. Defendant also did not respond to Plaintiff's undeveloped argument regarding the conservative nature of Plaintiff's treatment in her opposition brief and Plaintiff did not bring up the issue in her reply brief. (*See* Docs. 17 at 8–9 and 18 at 2–4.)

In view of the parties' cursory treatment of this argument, the Court declines to determine whether Plaintiff's treatment is properly characterized as conservative. *See Babick v. Comm'r*, No. 2:14–cv–1312–KJN, 2015 WL 5009064, at *7 n.5 (E.D. Cal. Aug. 20, 2015) (declining to address an argument that was "too undeveloped for the court's consideration"); *Carmickle v. Comm'r*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) ("We do not address this finding because Carmickle failed to argue this issue with any specificity in his briefing."); *see also Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (alterations in original) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009))). Moreover, even if the ALJ erred in characterizing Plaintiff's treatment as conservative, such error would be harmless because the ALJ properly found Dr. Foxley's opinion was conclusory and inconsistent with other medical evidence in the record including objective medical evidence and other medical opinions. *Barber v. Astrue*, No. 1:10–cv–01432–AWI–SKO, 2012 WL 458076, at *13 (E.D. Cal. Feb. 10, 2012) (finding harmless error where the ALJ "stated other valid reasons" for rejecting a physician's opinion) (citing *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006) and *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005)).

## C.     The ALJ Stated Sufficient Reasons for Rejecting Dr. Emerzian's Opinion.

Dr. Emerzian was Plaintiff's chiropractor and treated her in conjunction with her state workers' compensation claims. While Dr. Emerzian regularly opined that Plaintiff could return to work without restrictions between 2011 and 2013 (*e.g.*, AR 291–330, 332–51), Dr. Emerzian also opined that Plaintiff was temporarily disabled on a monthly basis at various times in the record

(*e.g.*, AR 283–86, 331, 441, 445, 447, 449–50, 454–55, 463, 465–69, 472, 475). In discrediting Dr. Emerzian's opinions that Plaintiff was disabled, the ALJ noted that Dr. Emerzian is a chiropractor and thus, not an acceptable medical source. (AR 25.) The ALJ further noted that Dr. Emerzian's opinions were in the context of Plaintiff's workers' compensation claim, which applies different standards for disability than a social security claim, and Dr. Emerzian's conclusory statements that Plaintiff was disabled is a finding reserved for the Commissioner. (AR 25.)

Chiropractors, such as Dr. Emerzian, are not included in the list of "acceptable medical sources" who may provide an opinion as to whether a claimant has a medically determinable impairment. 20 C.F.R. §§ 404.913(a), 404.1513(a) (effective Sept. 3, 2013 to Mar. 26, 2017);[9] *Figueroa v. Astrue*, No. 2:10–cv–01818 KJN, 2011 WL 4084852, at *3 (E.D. Cal. Sept. 13, 2011) ("Under the applicable regulations, chiropractors . . . are not 'acceptable medical sources.' . . . Only acceptable medical sources may provide medical opinions."). Instead, chiropractors are "other sources," whose opinions are given less weight than those from "acceptable medical sources," but who may help the ALJ "understand how [the claimant's] impairment affects [the claimant's] ability to work." *Lederle v. Astrue*, No. 1:09–cv–01736–JLT, 2011 WL 839346, at *11 (E.D. Cal. Feb. 17, 2011) (citing *Gomez v. Chater*, 74 F.3d 967, 970–71 (9th Cir. 1996)); 20 C.F.R. §§ 404.913(d), 404.1513(d). While chiropractors are not "acceptable medical sources" for evidence of impairment, the ALJ still must "provide reasons that are germane to the witness" when discounting their opinions. *Hill v. Comm'r*, No. 1:14–cv–01813–SAB, 2016 WL 5341274, at *2 (E.D. Cal. Sept. 23, 2016) (citing *Molina*, 674 F.3d at 1111).

Here, the ALJ provided multiple germane reasons for discounting Dr. Emerzian's opinions. Specifically, the ALJ noted that Dr. Emerzian opinions related to temporary restrictions in Plaintiff's ability to work for purposes of her workers' compensation claim. (AR 25.) As the ALJ discussed, the rules for disability for a workers' compensation claim are different from the rules for social security claims, which require Plaintiff to be disabled for a continuous period of twelve months. 20 C.F.R. §§ 404.1509, 416.909. Dr. Emerzian only opined Plaintiff was temporarily

---

[9] The Court "applies the law in effect at the time of the ALJ's decision." *Rose v. Berryhill*, 256 F.Supp.3d 1079, 1083 n.3 (C.D. Cal. 2017) (citing cases).

disabled for approximately one month at a time, but did not opine that Plaintiff was disabled for a continuous period of twelve months.  Thus, the ALJ properly gave Dr. Emerzian's opinions little weight in determining Plaintiff's eligibility for DIB and SSI under the applicable social security regulations.

Additionally, the ALJ discounted Dr. Emerzian's opinions because they were conclusory statements on an issue reserved for the Commissioner.  (AR 25.)   Between 2013 and 2015, Dr. Emerzian regularly checked the box on Plaintiff's treatment notes indicating she is to "remain off work" and added a "total temporary disability" period of approximately a month without any further explanation.  While the treatment notes also include Plaintiff's subjective complaints and Dr. Emerzian's examination findings, Dr. Emerzian does not explain why these findings cause Plaintiff to be totally disabled for the subsequent month.  In other words, Dr. Emerzian regularly concludes Plaintiff cannot work for one month a time, but never explains which subjective complaints or examination findings, preclude Plaintiff from working.  Further, whether Plaintiff is "disabled" or "unable to work" is an administrative finding reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  As the ALJ is entitled to discount such conclusory statements on issues reserved to the Commissioner, the ALJ did not err in giving little weight to Dr. Emerzian's opinions.  *Britton v. Colvin*, 787 F.3d 1011, 1012 (9th Cir. 2015) (An ALJ "may disregard medical opinion that is brief, conclusory, and inadequately supported by clinical findings."); *Nyman v. Heckler*, 779 F.2d 528, 531 (9th Cir. 1985) ("Conclusory opinions by medical experts regarding the ultimate question of disability are not binding on the ALJ").

## VI.   CONCLUSION AND ORDER

After consideration of Plaintiff's and Defendant's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   __**November 14, 2018**__                    _____ /s/ *Sheila K. Oberto* _____

UNITED STATES MAGISTRATE JUDGE